UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRICIA WHITE,

Plaintiff,

– against –

THE CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF EDUCATION; DENNIS
WALCOTT, CHANCELLOR; ELISA BROWN,
PRINCIPAL OF P.S. 249; ANA DEJESUS,
SIOLEN KELLY HO, ASSISTANT PRINCIPALS,
P.S. 249; BUFFIE SIMMONS, COMMUNITY
DISTRICT SUPERINTENDENT DISTRICT 17;
ALL SUED IN THEIR OFFICIAL AND
INDIVIDUAL CAPACITY,

Defendants.

**OPINION AND ORDER**
13 Civ. 7156 (ER)

Ramos, D.J.:

      Plaintiff Tricia White (the "Plaintiff" or "Mrs. White"), appearing *pro se*, brings this

action against her former employers, supervisors and co-workers:  the City of New York (the

"City"), the New York City Department of Education (the "BOE"),[1] Dennis Walcott, Elisa

Brown, Ana DeJesus and Buffie Simmons (collectively, the "Individual Defendants," and

together with the City and BOE, the "Defendants") in their official and individual capacities.

Plaintiff claims that Defendants unlawfully terminated her from her position as a special

education teacher in retaliation for speaking out against the school's administration and exposing

"special education fraud" there.  She further alleges that Defendants discriminated against her

due to her pregnancy, harassed her, caused the premature birth of her child, and lodged false

---

[1] Defendants refer to the New York City Department of Education as the "BOE," designating the Board of
Education of the City School District of the City of New York.  *See, e.g.*, Defs.' Reply Br. 1 n.1, Doc. 19.

accusations of corporal punishment against her, then deprived her of the ability to defend herself against them.  Plaintiff asserts that Defendants' false accusations not only contributed to her termination, but also prevented her from obtaining new employment.

Liberally construed, the Complaint asserts claims pursuant to 42 U.S.C. §§ 1983 and 1985 for violations of Plaintiff's rights, and conspiracy to violate Plaintiff's rights, under the First and Fourteenth Amendments; an employment discrimination claim under Title VII of the Civil Rights Act of 1964; New York state law claims for wrongful termination, intentional and negligent infliction of emotional distress, fraud, "verbal harassment, with unjustified threats of future harm," and defamation; and claims under New York Civil Service Law § 75-b.  Compl., Doc. 1.  Plaintiff seeks more than two million dollars in damages, punitive damages and costs, a declaratory judgment stating that Defendants violated her rights, and injunctive relief.  *Id.*

Before the Court is Defendants' motion to dismiss all of Plaintiff's claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Doc. 11.  Defendants seek dismissal on the grounds that Plaintiff has failed to:  (1) timely file notice for her New York state law claims, which are also time-barred; (2) state a claim pursuant to 42 U.S.C. §§ 1983 or 1985; (3) exhaust her administrative remedies for her Title VII claim; (4) allege municipal liability for her claims against the BOE or its officers in their official capacities; and (5) allege liability against the City, as it is an improper party.  *See* Defs.' Mem. L. Supp. Mot. Dismiss ("Defs.' Mem.") 2, Doc. 12.

For the reasons discussed below, Defendants' motion is GRANTED and Plaintiff's complaint is dismissed.

## I. BACKGROUND

The Court accepts the following allegations as true for purposes of this motion.[2]

---

[2] Some of the allegations appear in documents attached to the complaint and incorporated by reference, as well as in Plaintiff's opposition to the motion to dismiss.  "[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss,

## A. The Parties

### 1. Plaintiff

On September 7, 2010, Plaintiff began employment as an untenured special education teacher for Defendant BOE.[3]  Compl. ¶¶ 27, 31.  She was assigned to work at the Caton School, also known as "P.S. 249," in Brooklyn, New York.  *Id.*  Mrs. White has a license for "Special Education Day"[4] and several certifications within the State of New York that allow her to teach general students and students with disabilities in all grade levels, from pre-kindergarten through twelfth grade.  *Id.* ¶ 18.  Throughout the 2010-2011 academic year, Plaintiff received a rating of "satisfactory" for her lesson observations and performance evaluations.  *Id.* ¶¶ 19, 28.  This case arises from allegations of harassment, discrimination and retaliation that Mrs. White claims she suffered during the 2011-2012 school year.

### 2. Defendants

Defendant Dennis Walcott ("Chancellor Walcott") is the Chancellor of Defendant BOE. *Id.* ¶ 21.  Plaintiff alleges that Chancellor Walcott worked with the other co-Defendants to "assist in the[ir] misconduct and [lodge] false claims" against her.  *Id.*  Defendant Buffie Simmons ("Superintendent Simmons") was, and is, the "Community District Superintendent" for District 17, which includes the Caton School.  *Id.* ¶ 22.  Defendant Elisa Brown ("Principal Brown") served as the principal of the Caton School, and Defendants Ana DeJesus ("Assistant Principal

---

it is appropriate for the court to consider materials outside of the complaint to the extent they are consistent with the allegations in the complaint."  *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (quotation marks omitted) (collecting district court cases), *vacated in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004); *see also Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (considering allegations in *pro se* plaintiff's opposition to motion to dismiss).

[3] The BOE is considered a "public employer" as defined by the New York State Civil Service Law.  N.Y. Civ. Serv. Law § 75-b (1)(a)(iii) (McKinney).

[4] Presumably, to teach special education students during the daytime.

DeJesus") and Siolen Kelly Ho ("Assistant Principal Ho") were both assistant principals there. *Id.* ¶¶ 23-25.   Plaintiff alleges that each of the Individual Defendants had responsibility for creating and implementing policies that comply with city, state and federal law.  *Id.* ¶¶ 21-25.

## B. Factual Allegations

At the start of the 2011-2012 academic year, Plaintiff was three months pregnant.  *Id.* ¶ 31.  Assistant Principal DeJesus told Plaintiff that she should not have a baby while working as an untenured teacher.  *Id.*

In addition to "harassing" her due to her pregnancy, Plaintiff claims that Defendants targeted her for disciplinary action because they wanted to suppress information about their failure to provide appropriate educational services for special needs students at the Caton School. *Id.* ¶ 37.  As a supplement to the lessons provided by special education teachers in public schools, "related service providers" implement Individual Education Programs ("IEPs")—personalized plans for student growth—for special education students.  Plaintiff appears to allege that, at the Caton School, such special education service providers—who are employed by outside agencies, not the school itself—are supposed to work with students in person, on an individual basis, and during school hours, as set forth in each student's IEP.  At one point,[5] Assistant Principal DeJesus asked Plaintiff to write IEP goals for students who were not receiving services from related service providers.  *Id.* ¶ 29.  Specifically, Ms. DeJesus instructed Plaintiff to write "speech codes," meaning, speech-related education plans, for students who did not receive speech services.  *Id.*  "Supervisors" threatened Plaintiff that they would give her an

---

[5] Although the Complaint specifies the 2010-2011 academic year for this allegation, the Court assumes that Plaintiff meant to state 2011-2012 in light of her contention that the "critical period" for her retaliation claim started in September 2011.  *See* Compl. ¶¶ 31-32.

unsatisfactory ("U") rating on her evaluation if she did not comply with this directive, even though Plaintiff believed that it was out of compliance with special education protocol. *Id.* ¶ 30.

Documents attached to the Complaint[6] indicate that, on Thursday, September 22, 2011, Assistant Principal DeJesus observed an occupational therapist working with a student in Plaintiff's classroom. Assistant Principal DeJesus and Mrs. White discussed the possibility that the therapist would work with that particular student in the classroom at certain times, and Mrs. White apparently agreed to permit such services in the classroom. Assistant Principal DeJesus emphasized to Mrs. White the importance of allowing related service providers to work with students in the classroom, noting "that the child must be able to function in her classroom and can only do so when the services needed for her academic growth are provided where she spends most of her day, in the classroom." Compl. Ex. 2 (Oct. 28, 2011 Ltr.).

On Saturday, September 24, 2011, Mrs. White sent several e-mails (the "September 24, 2011 Emails") to certain related service providers that she believed were not appropriately providing services to her students. Plaintiff claims that these service providers had not been communicating feedback to her, and parents had expressed reservations about their children's progress. Compl. ¶ 32, Ex. 1. Mrs. White copied Assistant Principal DeJesus on the September 24, 2011 Emails, the first of which stated as follows:

> [8:23 a.m.]
>
> All service providers MUST FOLLOW each individual student's IEP. If a student [sic] IEP states, "2 twice a week, 30 minutes, SEPARATE LOCATION," please provide theses [sic] services as is. Students [sic] IEP should not be amended based on personal opinions or judgments. If you have any questions about any student receiving related services and you want to make any changes, please follow the correct protocols to do so.

---

[6] As discussed *infra*, Plaintiff attaches several letters to the Complaint, including a disciplinary letter dated October 28, 2011 written by Assistant Principal DeJesus. To the extent that they are consistent with Plaintiff's allegations, the Court deems such letters incorporated into the Complaint by reference. *Donhauser*, 314 F. Supp. 2d at 121.

Mrs. White

Compl. Ex. 1 at 1-3 (emphasis in original).  At 8:36 a.m., Assistant Principal DeJesus emailed

Mrs. White to ask who the email was for, and instructed Plaintiff to meet with her on Monday,

September 26, 2011 "as soon as you get in."  *Id.*; Compl. ¶¶ 33-34.  At 2:02 p.m., Mrs. White

responded:  "I am just doing my job while providing and advocating for my students, based on

their needs and what is written on a state legal document.  I will definitely speak to you [as soon

as possible] on Monday about the matter."  *Id.* at Ex. 1.  Minutes later, Mrs. White sent another

email to related service providers, again copying Assistant Principal DeJesus, which stated:

> [2:13 p.m.]
>
> If you have not provided me with your schedule, please try and do so [as soon as possible] so that I could informed [sic] students [sic] parents.  If schedules overlap with other related service providers, please make an extra effort to work out a time that will work for everyone.  If a prescription is needed in order to provide services, please put it in writing, so that I could [sic] inform the parents.  Also, reader's workshop is a very important instruction time.  It is usually during 2nd period, so if possible, please could related services be schedule [sic] around that time :) [sic].  However, based on each student, exceptions could be made.
>
> Mrs. White

*Id.*

At the meeting on September 26, 2011, Assistant Principal DeJesus directed Mrs. White

not to "put 'stuff' like that in e-mails"—referring to the content of the September 24, 2011

Emails—"because the school could get in trouble."  *Id.* ¶ 34.  According to documents attached

to the Complaint, on September 26, 2011, Assistant Principal DeJesus also saw Mrs. White

rubbing Principal Brown's hair while telling her that Ms. DeJesus displayed favoritism.  *Id.* at

Ex. 2 (Oct. 28, 2011 Ltr.).  When Ms. DeJesus asked Mrs. White to name the favorites, she

responded by laughing and did not answer.  *Id.*

6

On September 28, 2011, Plaintiff attended a meeting with her union representative, Assistant Principal DeJesus and Principal Brown.  At this meeting, Ms. DeJesus asked Plaintiff if she read the page of the teachers' handbook for P.S. 249 which provides, in relevant part, that all e-mails must be preapproved by the principal.  *Id.*  Plaintiff stated, "I am not sure."  *Id.*  Plaintiff also indicated that she had forwarded the September 24, 2011 Emails to three principals and two CEC[7] representatives, and they did not believe that the content was insubordinate.  *Id.*  When asked by Principal Brown if Plaintiff addressed her concerns about the related service providers with Assistant Principal DeJesus before sending the September 24, 2011 Emails, Plaintiff replied that she "[did not] want to bother Ms. DeJesus."  *Id.*

### 1.   The October 28, 2011 Disciplinary Letter

Plaintiff asserts that, in retaliation for sending the September 24, 2011 Emails, Assistant Principal DeJesus placed a letter in her personnel file on October 28, 2011 (the "October 28, 2011 Letter") that described several acts of "insubordination" committed by Plaintiff.  *Id.* ¶ 35; Ex. 2.  First, the October 28, 2011 Letter states:

> On Thursday, September 22, 2011, I [Assistant Principal DeJesus] entered your classroom at approximately 9:15 [a.m.] and Mrs. Williams, [a student's] occupational therapist[,] was servicing [the student] in your classroom.  We briefly discussed the possibility of servicing [that student] in the classroom at certain times. I stated that this was acceptable and directed the [occupational therapy] provider to provide services within the classroom.  We further discussed that related service providers can provide services within the classroom.  In addition, I stated that the child must be able to function in her classroom and can only do so when the services needed for her academic growth are provided where she spends most of her day, in the classroom.  On Saturday, September 24, 2011 at 8:23 [a.m.], I received an email from you directing all related service providers to conduct all services in a separate location.  In addition, you directed all related service providers to follow the student's IEP without my approval.

---

[7] The meaning of this acronym is not apparent to the Court, as Plaintiff's allegations do not define the term.

*Id.* at Ex. 2.  The October 28, 2011 Letter also cites the portion of the P.S. 249 teacher's

handbook requiring that all emails be pre-approved by Principal Brown and describes the

encounter on September 26, 2011 during which Plaintiff allegedly rubbed Principal Brown's

hair.  *Id.*  The letter concludes as follows:

> [T]he conduct you [Mrs. White] exhibited, namely failing to take my directive of
> allowing the related service providers to provide the services within the classroom
> at certain times, writing an email without approval to all related service providers,
> your inappropriate touching of the principal and your remarks to me constitutes
> insubordination, dereliction of duty and conduct unbecoming a professional
> educator … You are reminded of your obligation to follow my supervisory
> directions and address me in a professional manner.  Please be advised this incident
> may lead to further disciplinary action including an unsatisfactory rating and your
> termination.

*Id.* at 2.

Plaintiff claims that "the staff at P.S. 249 routinely sent emails without first obtaining

approval of the principal," a fact which Plaintiff pointed out at the time of her disciplinary letter.

*Id.* ¶ 36.  Plaintiff believes that she was "singled out" because of her attempt to expose the "lack

of proper servicing of special needs children" at the Caton School.  *Id.* ¶¶ 36-37.  After this

incident, Assistant Principal DeJesus "verbally harassed" and threatened to terminate Mrs. White

because of her non-tenured status.  *Id.* ¶ 38.

### 2.  Denial of External Professional Development Opportunities

Acting in further retaliation for her speech, and to punish her status as a pregnant person,

Defendants allegedly denied Mrs. White opportunities to engage in professional development

("PD") workshops outside of the school, in violation of her "tenure process rights."  *Id.* ¶ 39.

Principal Brown explained to Plaintiff that the school did not want to be held responsible if she

was harmed on the way in or out of the building.  *Id.*  Assistant Principal DeJesus "repeatedly

told Plaintiff that she should never have become pregnant during her probationary period." *Id.*
Defendants did not offer Plaintiff any external PD opportunities until after she gave birth. *Id.*

### 3.  Plaintiff's December 11, 2011 Union Grievance

Plaintiff filed a "Special Ed Complaint Form" with the United Federation of Teachers
("UFT") on December 11, 2011.  *See* Compl. Ex. 6 (the "Special Ed Complaint").  Plaintiff
informed UFT that she received satisfactory ratings for her evaluation during the 2010-2011
academic year, but complained that her students were not receiving related services and that
nothing changed with respect to provision of services after she brought the issue to Principal
Brown's attention.  *Id.*  Plaintiff explained to UFT that Assistant Principal DeJesus placed a
letter in her file after she sent the September 24, 2011 Emails.  Plaintiff also complained that Ms.
DeJesus told her (1) to "rewrite 12 IEPs this week for the 12 … students [she had]," and (2) that
because Plaintiff had planned on taking maternity leave for six weeks at the end of February, she
should "'go ahead and write the IEP[s] even though most of them are due in April, May, [and]
June … because I don't know your situation,' implying that [Plaintiff] might not be coming
back." *Id.* Plaintiff told Assistant Principal DeJesus that "it is illegal to re-write IEPs before
giving the students the opportunity and time length to meet their goals – which is equivalent to
one year." *Id.*  Assistant Principal DeJesus responded by issuing another disciplinary letter to
Plaintiff requesting a meeting with Principal Brown.  *Id.*[8]

In response to Plaintiff's Special Ed Complaint, Emma Mendez of UFT advised Plaintiff
to consult the UFT Chapter Leader and District Representative regarding "guidance … on how to
document and proceed with" the issue of "the harassment that you seem to be experiencing."  *Id.*

---

[8] Other than the limited reference to it in the Special Ed Complaint, the record is silent regarding the content of this disciplinary letter.

### 4.   The January 11, 2012 Incident and April 4, 2012 Disciplinary Letter

Plaintiff alleges that Defendants continued to retaliate against her by falsely accusing her of corporal punishment.  On January 11, 2012, during Plaintiff's seventh month of pregnancy, a student threw a book at her when she requested that the students hand in their books (the "January 11, 2012 Incident").  *Id.* ¶ 40.  Plaintiff claims that she gently slid the book back to the student and asked the student to hand the book to her.  *Id.*

Several days later, Plaintiff received a letter requesting that she meet with Assistant Principal DeJesus and a union representative on January 23, 2012.  *Id.* ¶¶ 40-41.  During that meeting, Plaintiff stated that she threw the book at the student but felt she did nothing wrong "because she did not hit [the student]."  *Id.* at Ex. 2.  Plaintiff claims that, as a result of Defendants' harassment, she prematurely went into labor on January 27, 2012.[9]  *Id.* ¶¶ 39, 41. Her due date had been in March 2012.  *Id.* ¶ 41.

Plaintiff returned from maternity leave in April 2012.  *Id.* ¶ 42.  Thereafter, Assistant Principal DeJesus informed Plaintiff that an investigation regarding the January 11, 2012 Incident had been conducted, and another letter was placed in her personnel file for corporal punishment dated April 4, 2012 (the "April 4, 2012 Letter").  *Id.* at Ex. 2 at 3-4.  Specifically, the April 4, 2012 Letter describes the investigation as follows:

> Chancellor[']s [R]egulation A-420 defines corporal punishment as "any act of force upon a pupil for the purpose of punishment[.]"
> On January 11, 2012 at approximately 9:15 AM in Room 103, you, out of anger, threw the book at [the student] rather than following a more appropriate manner of punishing the student for his mis-behavior [sic].
> …
> On January 11, 2012, at approximately 9:15 AM in Room 103, you behaved in a manner unbecoming of a professional when you threw a book at [the student] because he threw it at you first.

---

[9] While Exhibit 2 to the Complaint indicates that she attended a meeting on January 23, 2012, prior to going into labor, Plaintiff appears to allege that she went into labor *before* the meeting (Compl. ¶ 41).

> On January 11, 2012, at approximately 9:15 AM, in Room 103, you were in violation of Chancellor's Regulation A-420 when you threw a book at a student. This allegation of corporal punishment is substantiated against you.

According to the April 4, 2012 Letter, Plaintiff declined to submit a written statement to the administration regarding the January 11, 2012 Incident.  *Id.*  The April 4, 2011 Letter directed Plaintiff to "in the future be in compliance with all Chancellors' regulations" and school policies, and informed her that she may be rated "unsatisfactory" for the current school year, which could lead to termination.  *Id.*[10]

Plaintiff contends that the allegation of corporal punishment lodged against her was false, and that Defendants denied her due process to defend herself.  Plaintiff claims the BOE did not question her or inform her of any investigation before she received the April 4, 2011 Letter, and that the BOE did not inform her, the students' parents or her union that they filed an incident report with the Office of Special Investigation.  *Id.* ¶ 40.

Plaintiff claims that, in addition to satisfactory ratings that she received for four observations during the school year, she had an excellent attendance record, even in spite of her maternity leave.  *Id.* ¶ 42.  However, on June 7, 2012, the administration at the Caton School told Plaintiff that she would be receiving an unsatisfactory ("U") rating for the 2011-2012 school year.  *Id.*  On June 29, 2012, Superintendent Simmons "affirmed Plaintiff's discontinuance" due to the "U" rating.  *See* Compl. Ex. 5 (Letter from B. Simmons).  On August 13, 2012, Plaintiff discussed the discontinuance with Simmons, who informed Plaintiff that she received a placement at a new school, P.S. 375.  *Id.* ¶ 42.  However, Plaintiff was never hired at P.S. 375 because her fingerprints were "flagged" as ineligible by the Department of Education Office of Personnel Investigations ("OPI") as a result of the January 11, 2012 Incident.  *Id.*  Plaintiff

---

[10] The letter bears Plaintiff's signature, an apparent acknowledgement of receipt.

claims that, since the discontinuance, she has not been able to obtain employment due to the "false 'U' rating." *Id.*

Plaintiff appeared at a Discontinuance Hearing[11] on October 26, 2012.  Her allegations do not state what transpired at that hearing.  However, Plaintiff believes that she remained on an "HR Connect blacklist"[12] until August 8, 2013, when she "cleared her file" by bringing Betsy Combier, a teacher advocate, and Steven Perez, a paraprofessional who witnessed the Incident, to OPI and explaining her innocence.  Compl. ¶ 42.  Mr. Perez also drafted an undated written statement corroborating Plaintiff's version of the events, indicating that he did not observe any abuse by Mrs. White.  *Id.* at Ex. 4 at 2.  Plaintiff claims that Mr. Perez would have testified on her behalf at an earlier juncture, but did not want to initially support her because Assistant Principal DeJesus threatened him by saying "remember who gave you a job."  *Id.* ¶ 40.

On October 9, 2013, Plaintiff filed the instant action.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in

---

[11] Section 4.3.2 of the BOE's bylaws, entitled "Appeals re Discontinuance of Probationary Service," provides that:

> Any person in the employ of the City School District who appears before the Chancellor, or a committee designated by the Chancellor, concerning the discontinuance of service during the probationary term, or at the expiration thereof, shall have a review of the matter before a committee which shall be designated in accordance with contractual agreements covering employees or by regulations of the Chancellor, as appropriate.

> After the review, the committee shall forward its advisory recommendation to the community superintendent or to the Chancellor in accordance with contractual agreements.

*Kahn v. N.Y.C. Dep't of Educ.*, 18 N.Y.3d 457, 463 (N.Y. 2012).  Pursuant to section 4.3.3, "the employee is entitled to appear in person at the hearing, accompanied by an advisor; to be confronted by and call witnesses; and to examine exhibits and introduce relevant evidence.  The CBA calls for the section 4.3.2 review to be conducted by a tripartite committee of professional educators, with one selected by the teacher, one by BOE and the third by the other two from an agreed-upon list."  *Id.*

[12] The Court interprets the "HR Connect blacklist" to be internal to the City of New York Department of Education based on facts alleged by the Plaintiff.

the plaintiff's favor. *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). However, this requirement does not apply to legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to satisfy the pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Id.* at 678 (citing *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

In the case of a *pro se* plaintiff, the Court is obligated to construe the complaint liberally, *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011), and to interpret the claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006); *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citing *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). The obligation to read a *pro se* litigant's pleadings leniently "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III. DISCUSSION

### A. Plaintiff's Section 1983 Claims Are Dismissed

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that:  (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).  "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  Thus, a civil rights action brought under § 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law.  *Id.*

Liberally construed, the Complaint asserts claims under 42 U.S.C. § 1983 for First Amendment retaliation and violations of her rights guaranteed by the Due Process and Equal Protection clauses of the Fourteenth Amendment.[13]

### 1.  First Amendment Retaliation Claim

Plaintiff claims that Defendants retaliated against her for speaking out regarding "special education fraud" at the Caton School.

"Government employers, like private employers, need a significant degree of control over their employees' words and actions" to ensure that employees do not "contravene governmental policies or impair the proper performance of governmental functions."  *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006).  A government entity in the form of an "employer charged with

---

[13] While Plaintiff also cites the Fifth and Seventh Amendments, *see* Compl. ¶ 1, neither amendment provides a basis for an additional cause of action.  The Court construes Plaintiff's citation to the Seventh Amendment as support for her request for a civil jury trial, U.S. Const. Amend. VII, and the Fifth Amendment has no applicability here, as Defendants are state, not federal, actors.

providing such essential services as public safety and education," rather than a sovereign governing its citizens, has "greater leeway" under the Constitution "to control employees' speech that threatens to undermine its ability to perform its legitimate functions." *Jackler v. Byrne*, 658 F.3d 225, 234 (2d Cir. 2011) (citation omitted).

While government employees have diminished speech rights as compared with private citizens, government employment "does not … eviscerat[e] … an employee's First Amendment rights." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quoting *Hale v. Mann*, 219 F.3d 61, 70 (2d Cir. 2000) (quoting *Connick v. Myers*, 461 U.S. 138, 140 (1983)). "It is by now well established that public employees do not check all of their First Amendment rights at the door upon accepting public employment." *Lewis v. Cowen*, 165 F.3d 154, 158 (2d Cir. 1999). Regarding certain topics, it "is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Connick*, 461 U.S. at 149. Accordingly, in First Amendment, public employee freedom of speech cases, courts must achieve a balance between the interest of the public employee "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

Following *Garcetti*, courts employ a two-step approach to evaluate whether the First Amendment protects employee speech from retaliation. First, the court inquires "whether the employee spoke as a citizen on a matter of public concern." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotation marks and citation omitted). If the answer to this question is no, then "the employee has no First Amendment cause of action based on … her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. If the answer is yes, the court must then decide "whether the relevant government entity had an adequate justification for

treating the employee differently from any other member of the general public." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Garcetti*, 547 U.S. at 418.

The first factor, "whether the employee spoke as a citizen on a matter of public concern," consists of two subcomponents:  "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee." *Matthews v. City of New York*, 957 F. Supp. 2d 442, 451 (S.D.N.Y. 2013) (quoting *Jackler*, 658 F.3d at 235).  Speech is of public concern if it relates to political, social or other community concerns, rather than an employee's personal concerns. *Johnson*, 342 F.3d at 112 (citing *Connick*, 461 U.S. at 146); *Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006) (same). Generally, "discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern"; if the government entity cannot show that such speech would impact or disrupt the government employer's functions, then it may receive First Amendment protection. *See Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) (citation and internal punctuation omitted).  Matters of public concern also include "speech aimed at uncovering wrongdoing or breaches of the public trust." *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (quoting *Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir. 1993)).

Importantly, however, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421, 423; *Connick*, 461 U.S. at 146; *Healy v. City of New York Dep't of Sanitation*, 286 F. App'x 744, 746 (2d Cir. 2008) (summary order) (holding that speech is not protected where it "ar[i]se[s] in the course of official job duties.").  Thus, the First Amendment does not shield

16

work environment correspondence.  *Frisenda v. Incorporated Village of Malverne*, 775 F. Supp. 2d 486, 507 (E.D.N.Y. 2011) (holding that correspondence between police officer employees pertained to the "core function" of the officers' employment thus fell beyond the First Amendment's purview).  Although context determination for public employees' speech may be fact-intensive, it is a matter of law left to the court.  *Johnson*, 342 F.3d at 112; *accord Ruotolo*, 514 F.3d at 189.  While "there is no categorical approach," courts evaluate the "content, form, and context of a given statement."  *Norton v. Breslin*, No. 13 Civ. 1962, 2014 WL 1851888, at *1-*2 (2d Cir. May 9, 2014) (summary order) (quoting *Hoyt*, 433 F.3d at 330).

Here, Plaintiff claims that Defendants terminated her in retaliation for sending the September 24, 2011 Emails and complaining to parents about the policies for servicing special needs students at the Caton School.  Compl. ¶ 11.  Plaintiff contends that her speech regarding the servicing of special needs students is protected by the First Amendment because she spoke as a private citizen on a matter of public concern.  Pl.'s Opp. 17-21, Doc. 18.  While possible violations of special education laws may be of public concern, Plaintiff was clearly acting within the scope of her official duties when she made specific, work-related demands of the service providers that she emailed.  After Assistant Principal DeJesus asked to speak with her concerning the September 24, 2011 Emails, Plaintiff responded by acknowledging that "[she was] just doing [her] job while providing and advocating for [her] students, based on their needs and what is written on a state legal document."  Compl. Ex. 1 at 2.  Indeed, Plaintiff alleges that she sent the emails "with the *sole* purpose of improving the education and performance of her students."  Compl. ¶ 33 (emphasis added).  The Court thus finds Plaintiff's argument that she "was not speaking generally as an advocate for her students, nor as an employee as part of her duties" (Pl.'s Opp. 20) unavailing.

The Court also rejects Plaintiff's argument that her speech was protected because it was not a required part of her job description or "core function."  *Frisenda*, 775 F. Supp. 2d at 507 (holding that communication stimulated by employee's concern about abilities to perform job-related functions is not speech made as a public citizen); Pl.'s Opp. ¶ 34.  Arguments that job responsibilities do not expressly encompass the speech in question are particularly unpersuasive. *See Ross v. New York City of Dep't of Educ.*, 935 F. Supp. 2d 508, 521 (E.D.N.Y. 2013) (referring to such arguments as "red herring[s]"); *see also Massaro v. The Dep't of Educ. of the City of New York*, No. 08 Civ. 10678 (LTS) (FM), 2011 WL 2207556, at *4 (S.D.N.Y. June 3, 2011), *aff'd sub nom. Massaro v. New York City Dep't of Educ.*, 481 F. App'x 653, 656 (2d Cir. 2012) (summary order) ("Regardless of whether Plaintiff was formally tasked with alerting the school to the unsanitary condition in her classroom, ensuring that the room provided a safe learning environment was part of her duties as an educator.").  "[F]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient" to establish that it falls "within the scope of the employee's professional duties for First Amendment purposes."  *Garcetti*, 547 U.S. at 424-25.  Speech that is not expressly required can still be "pursuant to official duties," as long as the speech is in furtherance of those duties expressed.  *Id.* at 421, 444.

Plaintiff's speech pertaining to the location and scheduling of the services for her special education students clearly falls within the scope of her professional duties.  Compl. Ex. 1.  The language that she used in the September 24, 2011 Emails does not "[bear] similarities to letters [or e-mails] submitted by numerous citizens every day"—it is that of a concerned teacher, not a concerned citizen.  *Garcetti*, 547 U.S. at 422 (citing *Pickering*, 391 U.S. 563).  Although

Plaintiff argues that a teacher's job description might not explicitly require reporting on "special education irregularities," duties of "ensuring that a classroom is well supplied, safe, and conducive to learning and that the curriculum is substantively appropriate—are quintessentially those of a teacher." *Felton v. Katonah Lewisboro Sch. Dist.*, No. 08 Civ. 9340 (SCR), 2009 WL 2223853, at *5 (S.D.N.Y. July 27, 2009) (granting motion to dismiss First Amendment claim due to plaintiffs' failure to adequately plead that they spoke as citizens, "rather than pursuant to their official duties").

Accordingly, Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim is GRANTED.[14]

### 2.  Fourteenth Amendment Claims

#### i.  Due Process

Plaintiff asserts that Defendants violated her rights by discontinuing her employment and giving her an unsatisfactory rating for the 2011-2012 school year without affording her due process of law.

Courts "examine procedural due process questions in two steps:  the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  When analyzing procedural due process violations, the threshold issue is always whether the plaintiff possessed a

---

[14] To the extent that the Complaint can be construed to allege First Amendment retaliation for Plaintiff's decision to file the Special Ed Complaint, the Court likewise dismisses such claim.  Plaintiff's Special Ed Complaint expressed concern about the Defendants' response to the September 24, 2011 Emails and complained of "special education fraud" at P.S. 249.  Compl. Ex. 6.  Yet, because filing a grievance with a union is "not a form or channel of discourse available to non-employee citizens," it is not speech made as a public citizen, and thus falls outside of the umbrella of First Amendment protection. *Weintraub v. Bd. Of Educ.*, 593 F.3d 196, 204 (2d Cir. 2010).  "[T]he First Amendment invests public employees with certain rights, [but] it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154).  Thus, Plaintiff's grievance lacks First Amendment protection and cannot form the basis of a retaliation claim.

valid property or liberty interest.  *See Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 427-28 (2d Cir. 2011); *see also Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (citing *Brady v. Town of Colchester*, 863 F.2d 205, 211-12 (2d Cir. 1988)) ("a party must *first* establish that he had a valid 'property interest' in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit." (emphasis in original)).

### 1.  Property Interest

The Constitution protects, but does not create, property rights.  "Rather, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 629 (2d Cir. 1996) (citation omitted).  Thus, here, Plaintiff must show that, under New York law, she "had a constitutionally-protected 'legitimate claim of entitlement'" to employment.  *Id.* (citation omitted).

Plaintiff started working for the BOE on September 7, 2010.  Compl. ¶ 18.  Throughout her employment at the Caton School, Plaintiff was an untenured or "probationary" employee, as she had not completed the three years of probationary employment required to be eligible for tenure.  Compl. ¶ 39; N.Y. Educ. Law § 2573(1)(a) (McKinney).  It is well-settled under New York law that a teacher lacks a property interest in probationary employment because "services of a probationary teacher may be discontinued at any time during the probationary period." *Federico v. Bd. of Educ. of Pub. Sch. of Tarrytowns*, 955 F. Supp. 194, 202 n.1 (S.D.N.Y. 1997) (citing *Donato*, 96 F.3d at 629); *accord Blasi v. New York City Bd. of Educ.*, No. 00 Civ. 5320 (RRM) (MDG), 2012 WL 3307227, at *9 (E.D.N.Y. Mar. 12, 2012), *report and recommendation adopted*, No. 00 Civ. 5320, 2012 WL 3307346 (E.D.N.Y. Aug. 12, 2012), *aff'd*, 544 F. App'x 10

(2d Cir. 2013).  "An interest that can be terminated 'at the whim of another person' is not protected by the Due Process clause."  *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (citation omitted).  Thus, as a probationary employee, Plaintiff lacked a property interest in her continued employment.  *Rivera v. Cmty. Sch. Dist. Nine*, 145 F. Supp. 2d 302, 306-07 (S.D.N.Y. 2001) ("Where there is no property interest in the employment, there can be no property interest in the procedures that follow from the employment.").

### 2.  Liberty Interest

Nonetheless, Plaintiff's allegations may also be construed to assert that Defendants violated her due process rights by lodging false accusations against her that precluded her from obtaining a new job.  "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983."  *Patterson v. City of Utica*, 370 F.3d 322, 329–30 (2d Cir. 2004).  However, the Second Circuit has "recognized that a probationary employee can 'invoke the protections of the Due Process Clause' where that employee has suffered a loss of reputation 'coupled with the deprivation of a more tangible interest, such as government employment.'"  *Segal v. City of N.Y.*, 459 F.3d 207, 212 (2d Cir. 2006) (quoting *Patterson*, 370 F.3d at 330).  "A liberty interest is implicated where defamatory statements, made in connection with a probationary employee's termination, denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice ... her profession."  *Rivera*, 145 F. Supp. 2d at 307; *see also Donato*, 96 F.3d 623, 630 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)) (a previous employer's stigmatizing statements can constitute a deprivation of liberty if, for example, the

employer's actions deny the employee "freedom to take advantage of other employment opportunities.").

The test for statements impacting an employee's reputation is commonly known as "stigma plus." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005).  To state a "stigma plus" claim, "[t]he defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest." *Id.* (quoting *Donato*, 96 F.3d at 631–32).  An employee plaintiff must also allege that her former employer made statements of "professional incompetence" and denied her of a chance to clear or redeem her reputation.  *Roth*, 408 U.S. at 573; *Donato*, 96 F.3d at 630 ("When a state fires an employee and publicly charges that she acted dishonestly or immorally, due process guarantees the employee an opportunity to defend her good name.").  The statements and allegations must discuss the employee's inability to do a particular job and not simply state that an employee performed poorly.  *O'Neill v. City of Auburn*, 23 F.3d 685, 692 (2d Cir. 1994). Remarks that an unsatisfactory rating was based on "substantiated corporal punishment" can cause constitutional concerns "since the comment likely would limit employment or re-assignment opportunities in a profession that places its members in positions of trust and authority over children's physical safety and emotional well-being." *Storman v. Klein*, No. 09 Civ. 0338 (SHS) (AJP), 2009 WL 1035964, at *14 (S.D.N.Y. Apr. 20, 2009) (citations omitted). A plaintiff must allege that the defendant employers publicly attacked the professional competency of the plaintiff and that the defendant employers publicized unfavorable reasons for plaintiff's dismissal.

Here, Plaintiff fails to establish that Defendants made stigmatizing remarks about her professional competency.  Although Plaintiff refers to Defendants flagging her fingerprints for

the "ineligible/inquiry list," Plaintiff cites her discontinuance due to the "false 'U' rating" as the

reason she has been unable to obtain new employ.  Compl. ¶ 42.  Nor does she explain what the

"HR Connect blacklist" is.  The existence of a discontinuance on Plaintiff's record "might make

[her] somewhat less attractive to some other employers" but "would hardly establish the kind of

foreclosure of opportunities amounting to a deprivation of liberty."  *Russell v. Hodges*, 470 F.2d

212, 216 (2d Cir. 1972) (quoting *Roth*, 408 U.S. at 574 n.13).  Even if Plaintiff had alleged that

her "chances for equivalent future employment anywhere else [were] thin to none," such

allegations, standing alone, are "insufficient to show that [a plaintiff] has been foreclosed from a

range of other employment opportunities."  *Koehler v. New York City*, 04 Civ. 6929 (RMB),

2005 WL 3502042, at *3 (S.D.N.Y. Dec. 20, 2005).  Finally, because Plaintiff fails to allege

facts indicating that the "ineligible/inquiry" or "HR Connect" lists were public to future

employers, she fails to state a "stigma plus" claim.  *Id.* (holding that probationary employee's

placement on the "ineligible list" for future employment after being charged with corporal

punishment did not constitute stigmatization because the plaintiff did not allege that the

ineligible list publicly disclosed grounds for dismissal and therefore could not have attacked

professional competency); *Longarzo v. Anker*, 578 F.2d 469, 472 (2d Cir. 1978) (dismissing

claim by public school teacher where he failed to allege that the BOE publicized the unfavorable

ratings that he received).  Consequently, Plaintiff has failed to allege a deprivation of liberty

under the Due Process Clause.

### 3.  Procedural Rights

Even if Plaintiff had adequately alleged a protected property or liberty interest, her Due

Process claim would nonetheless fail because she does not plead the deprivation of any process

to which she was entitled.

"The second step of the [procedural due process] analysis … asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided." *Rivera*, 145 F. Supp. 2d at 306; *see also Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881–82 (2d Cir. 1996). "Due process requires, as a general matter, an opportunity to be heard at a meaningful time and in a meaningful manner." *Adams v. New York State Educ. Dep't*, 752 F. Supp. 2d 420, 455 (S.D.N.Y. 2010) (citations and internal quotation marks omitted), *aff'd sub nom. Ebewo v. Fairman*, 460 F. App'x 67 (2d Cir. 2012) (summary order). A "stigma plus" due-process claim cannot survive merely because a government employer said something allegedly stigmatizing or false about the plaintiff; the claim must be based on a denial of adequate processes to contest the allegedly damaging statement. *Segal*, 459 F.3d at 214 ("the availability of an adequate, reasonably prompt, post-termination name-clearing hearing [is] sufficient to defeat a stigma-plus claim" by an at-will government employee plaintiff). As the Second Circuit explained in *Segal*:

> Because stigma plus is a species within the phylum of procedural due process claims, however, it is not enough that the plaintiff has demonstrated the deprivation of her liberty interest; in order to bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was deprived without due process of law. Stated differently, the availability of adequate process defeats a stigma-plus claim.

*Id.*

Plaintiff contends that she was discontinued due to a "false 'U' rating" and that BOE Office of Personnel Investigations ("OPI") "flagged" her fingerprints for the "'ineligible/inquiry' list." Compl. ¶ 42. However, New York state law provides for special proceedings pursuant to Article 78, at which individuals—such as Plaintiff—may challenge actions by governmental bodies such as the BOE. N.Y. C.P.L.R. §§ 7801-06. "In cases where the state actor engaged in random and unauthorized acts, an Article 78 proceeding 'constitutes a wholly adequate post-

deprivation hearing for due process purposes.'"  *Sindone v. Kelly*, 254 F. App'x 58, 59 (2d Cir.

2008) (summary order) (quoting *Locurto v. Safir*, 264 F.3d 154, 175 (2d Cir. 2001)); *see also*

*Koehler*, 2005 WL 3502042, at *2 ("[A] non-tenured employee is not entitled to a pre-

deprivation hearing because such an employee does not have a property interest in her position."

(citation omitted)).  Because Article 78 provides a "meaningful opportunity" for Plaintiff to

challenge her discontinuance, due process is not lacking simply because she "fail[ed] to avail

[her]self of the opportunity."  *Giglio v. Dunn*, 732 F.2d 1133, 1134-35 (2d Cir. 1984); *accord*

*Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121 (2d Cir. 2011) ("An Article 78 proceeding

provides the requisite post-deprivation process—even if [plaintiff] failed to pursue it.").

     Moreover, Plaintiff's allegations reveal that she received a post-termination

discontinuance hearing on October 26, 2012, and that she ultimately "cleared her file" on August

8, 2013, when she presented witnesses and argument OPI to demonstrate her innocence while

represented by a "teacher advocate" (Compl. ¶ 42).  *See Moore v. New York City Dep't of Educ.*,

No. 03 Civ. 2034 (LAP), 2004 WL 691523, at *4 (S.D.N.Y. Mar. 31, 2004).  Though she

concedes that her name has been cleared, "[t]o the extent plaintiff believes that the hearing

officer reached an erroneous conclusion, plaintiff could have challenged the results at an Article

78 proceeding."  *Id.*  As such, Plaintiff cannot establish a violation of her due process rights.

     Thus, the Court GRANTS Defendants' motion to dismiss Plaintiff's Due Process claim.

### ii.  Equal Protection

Plaintiff alleges that she was wrongfully terminated because Defendants discriminated

against her based on her pregnancy, in violation of the Equal Protection Clause of the Fourteenth

Amendment.

     Courts evaluate Section 1983 employment discrimination claims asserted as equal

protection violations under the same standards as Title VII claims.  *See Patterson v. Cnty. of*

*Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004).  Generally, to state a claim for discriminatory

discharge under the Equal Protection clause:  "the plaintiff must show (1) that [s]he belongs to a

protected class; (2) that [s]he was performing h[er] duties satisfactorily; (3) that [s]he was

discharged; and (4) that h[er] discharge occurred under circumstances giving rise to an inference

of discrimination on the basis of h[er] membership in that class."  *Chick v. Cnty. of Suffolk*, 546

F. App'x 58, 59 (2d Cir. 2013) (summary order) (quoting *Chambers v. TRM Copy Ctrs. Corp.*,

43 F.3d 29, 37 (2d Cir. 1994)).

Sex-based classifications, like race, national origin, and alienage, are considered

protected classes.  *Frontiero v. Richardson*, 411 U.S. 677, 682 (1973) (citing *Reed v. Reed*, 404

U.S. 71 (1971)).  Here, while Plaintiff does not allege that she belongs to a protected class, the

Court can assume that she is a woman based upon the allegations concerning her pregnancy.

Compl. ¶ 31.  Although discrimination against pregnant women is not, per se, a sex-based form

of discrimination, *see Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 (1993), in

1978, Congress passed the Pregnancy Discrimination Act ("PDA"), which amended Title VII "to

prohibit sex discrimination on the basis of pregnancy."  *Codrington v. Carco Grp.*, No. 13 Civ.

2780 (SJF), 2014 WL 2945987, at *3 (E.D.N.Y. June 27, 2014).  To bring a claim under the

PDA, a plaintiff must show that she suffered an adverse employment action "while she was

'affected by pregnancy, childbirth, or related medical conditions.'"  *Briggs v. Women in Need,*

*Inc.*, 819 F. Supp. 2d 119, 126 (E.D.N.Y. 2011) (quoting 42 U.S.C. § 2000e(k)); *see also Helmes*

*v. South Colonie Cent. Sch. Dist.*, 564 F.Supp.2d 137, 147 (N.D.N.Y. 2008) ("Certainly, women

who are pregnant at or very near the time of the adverse employment action are members of the

protected class, as are women who are on maternity leave or recently have returned to work from

maternity leave when the employment action occurs.").  Courts determine when a plaintiff stops

being "affected by pregnancy, childbirth, or related medical conditions" based on the particular facts and circumstances of the case; however, "leaves-of-absence for childrearing purposes are not conditions protected under the PDA."  *Briggs*, 819 F. Supp. 2d at 127.  Additionally, while the determination of when a pregnant woman loses her status as a member of a protected class varies based upon the facts of each case, "a pattern has developed in this Circuit establishing a loose line at approximately four months from the date of birth."  *Albin v. LVMH Moet Louis Vuitton, Inc.*, No. 13 Civ. 4356 (JPO), 2014 WL 3585492, at *4 (S.D.N.Y. July 8, 2014) (collecting cases); *see also Pellegrino v. Cnty. of Orange*, 313 F. Supp. 2d 303, 317 (S.D.N.Y. 2004).

"A plaintiff can establish a *prima facie* case of pregnancy discrimination under Title VII by showing that (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee."  *Codrington*, 2014 WL 2945987, at *3 (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998) (internal quotation marks omitted)).  Alternatively, a plaintiff may establish the fourth element "by alleging that the discharge occurred under circumstances giving rise to an inference of discrimination."  *Hill v. Dale Electronics Corp.*, No. 03 Civ. 5907 (MBM), 2004 WL 2937832, at *2 (S.D.N.Y. Dec. 19, 2004).

Here, even assuming *arguendo* that Plaintiff adequately alleged that she was a member of a protected class, she fails to state a claim for discrimination based on her status as a pregnant person.  Plaintiff alleges that she gave birth on January 27, 2012 and that Superintendent Simmons affirmed her discontinuance on June 29, 2012, five months later.  Compl. ¶¶ 41-42. The timeframe alleged "is considered quite weak temporal correlation in this Circuit."

27

*Pellegrino*, 313 F. Supp. 2d at 317 (deeming a "four month temporal gap between knowledge of pregnancy and adverse employment action … [a] quite weak" proximity).

Moreover, Plaintiff does not claim that a non-pregnant—or any—employee filled her position, nor does she plead any facts describing treatment of similarly-situated pregnant persons. While she alleges that Defendant DeJesus criticized her for becoming pregnant, she never alleges that her pregnancy was the reason for her termination; such allegations of "stray remarks," standing alone, cannot support a discrimination suit. *Cf. Danzer v. Norden Sys.*, 151 F.3d 50, 56 (2d Cir. 1998) (internal quotations omitted) (holding that the employee had been fired due to discriminatory practices because he demonstrated more than just stray remarks). Plaintiff's failure to allege facts that give rise to an inference of pregnancy-based discrimination is fatal to her claim. *Cf. Albin*, 2014 WL 3585492, at *5 (finding that plaintiff stated a claim for discriminatory discharge based on pregnancy where she alleged that she was not promoted, she was recently pregnant and on maternity leave, a non-pregnant candidate was hired instead, the non-pregnant candidate was hired before she received her second interview, and that candidate was less qualified than plaintiff). Accordingly, Defendants' motion to dismiss Plaintiff's Equal Protection claim is GRANTED.[15]

### 3. Plaintiff's Title VII Claims Are Dismissed

Defendants also argue that, to the extent that Plaintiff seeks to assert a violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Court must dismiss it because she has failed to exhaust her administrative remedies relative to such claims. Defs.' Mem. ¶ 20.

---

[15] Claims under the Fourteenth Amendment are not restricted to multi-person classes; an individual, as a "class of one," can seek Equal Protection under the Fourteenth Amendment. *See, e.g.*, *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008). However, the Supreme Court has held that equal protection "class of one" claims do not apply in the public employer context. *Id.* at 605-607. Accordingly, Plaintiff cannot seek relief as a "class of one" here. *See id.* at 602.

Claimants under Title VII must file a complaint with the Equal Employment Opportunity Commission ("EEOC") "within 180 days after the alleged discriminatory act occurred," or "if [s]he has already filed the charge with a state or local agency that monitors fair employment practices, [she] must file [her] EEOC charge within 300 days of the alleged discriminatory act." *Falso v. Gates Chili Cent. Sch. Dist.*, 408 F. App'x 494, 495 (2d Cir. 2011) (summary order); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109-10 (2002); *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 831 (S.D.N.Y. 2013) (citing 42 U.S.C. § 2000e-5(e)(1)). "The filling deadlines for a charge of discrimination act as a 'statute of limitations' and a failure to timely file a charge acts as a bar to a plaintiff's action." *Butts v. New York City Dep't Of Hous. Pres. And Dev.*, No. 00 Civ. 6307 (KMK), 2007 WL 259937, at *6 (S.D.N.Y. Jan. 29, 2007), *aff'd sub nom. Butts v. NYC Dep't of Hous. Pres. & Dev.*, 307 F. App'x 596 (2d Cir. 2009) (summary order); *see also Francis v. City of N.Y.*, 235 F.3d 763, 767 (2d Cir. 2000) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385 (1982)).

Plaintiff does not claim to have filed a complaint with the EEOC prior to initiating the instant action, or ever. Plaintiff was required to file a claim with the EEOC within 300 days of the last discriminatory incident or within 180 days of filing a complaint with a State or local agency that monitors discriminatory behavior by employers. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 109-10. She has failed to do so. The Court construes the last alleged discriminatory act by the Defendants as occurring on June 29, 2012, the date of the letter affirming Plaintiff's termination. Compl. Ex. 5. at 1. Plaintiff filed the instant action on October 9, 2013, more than 300 days after June 29, 2012. Doc. 1. Moreover, Plaintiff submitted the Special Ed Complaint to UFT—a local agency—on December 8, 2011. Compl. Ex. 6 at 1-4. More than 180 days have passed since she filed that complaint.

29

Accordingly, to the extent that Plaintiff seeks to assert a Title VII claim, the Court GRANTS Defendants' motion to dismiss it due to her failure to comply with the applicable exhaustion requirements.

### 4.  Plaintiff's § 1985 Claims Are Dismissed

Plaintiff also brings claims under 42 U.S.C. § 1985(2)-(3) alleging that the Defendants conspired to deprive her of her constitutional rights.  In order to state of claim under § 1985, a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.  *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586-87 (2d Cir. 1988) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1970)).

Because she only alleges that BOE employees conspired with one another, Plaintiff's claim fails due to the "legal impossibility of pleading conspiracy by exclusive reference to actions of employees of a single corporation."  *Farbstein v. Hicksville Pub. Library*, 254 F. App'x 50, 51 (2d Cir. 2007) (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)); *see also Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (affirming the dismissal where defendants were all Southampton Police Department employees).  While an exception to the intracorporate conspiracy doctrine exists where coconspirators purportedly act based on personal motives wholly distinct from the interests of their organization, the exception does not apply where, as here, the alleged co-conspirators acted within the scope of their employment.  *Chillemi v. Town of Southampton*, No. 12 Civ. 3370 (ADS) (ETB), 2013 WL 1876443, at *12 (E.D.N.Y. May 4, 2013) ("For the exception to apply, '[t]he [P]laintiff must ... allege that [the Defendants]

acted other than in the normal course of their corporate duties.'" (citation omitted)).  Even if

Plaintiff alleged that Assistant Principal DeJesus harbored personal biases against her, or wanted

to "get rid of" her, such biases "do[] not constitute personal interest[s] and [are] not sufficient to

defeat the intracorporate conspiracy doctrine."  *Bond v. Board. of Educ. of City of New York*, No.

97 Civ. 1337 (NG), 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999).

Accordingly, Defendants' motion is GRANTED with respect to Plaintiff's § 1985 claims.

### 5.  Plaintiff's Claims against the City Are Dismissed

Defendants argue that the City is a distinct legal entity from the BOE, and cannot be held

liable for alleged wrongdoing committed by the BOE in the absence of any allegation directly

implicating it.  Defs.' Mem. 24; *Linder v. City of New York*, 263 F. Supp. 2d 585, 590-91

(E.D.N.Y. 2003) (citing *Campbell v. City of New York*, 203 A.D.2d 504 (2d Dep't 1994)).

The Mayor of the City of New York appoints the Chancellor of the New York City

Department of Education.  N.Y. Educ. Law § 2690-h.  Notwithstanding the Mayor's appointment

powers, however, the City and the BOE remain distinct legal entities.  *Gonzalez v. Esparza*, No.

02 Civ. 4175 (SWK), 2003 WL 21834970, at *2 (S.D.N.Y. Aug. 6, 2003) (describing recent

"changes in the statutory scheme regarding the interplay between the Board and the City" as

purely "'political,' with the [BOE] continuing to exist as a separate and distinct legal entity from

the City.").  Thus, neither can be held liable for the torts of the other.  *Id.*; *accord Perez v. City of

New York*, 41 A.D.3d 378, 379 (1st Dep't 2007) (noting that City and BOE remain separate).

Here, Plaintiff names the City as a party, but fails to allege anything more.  In *Linder v.

City of New York*, the court dismissed the plaintiff's claims against the City brought by a teacher

because it was not implicated in the sexual harassment and sexual assault claims that she asserted

against a fellow male teacher.  263 F. Supp. 2d at 590-91.  So too here, the City is an improper

party because Plaintiff has not alleged any facts implicating it in the alleged wrongdoing. *Wade v. New York City Dep't of Educ.*, No. 11 Civ. 05278 (LGS), 2014 WL 941754, at *5 (S.D.N.Y. Mar. 10, 2014) (citing *Linder*, 263 F. Supp. 2d at 590) (dismissing claims because plaintiff failed to "include allegations against agents of the City of New York," as distinct from the BOE).

Accordingly, the Court GRANTS Defendants' motion to dismiss all of Plaintiff's claims against the City.

### 6. State Law Claims

Defendants argue that Plaintiffs' state law claims are barred because she failed to timely file a notice of claim, nor has she complied with the applicable statute of limitations. Defs.' Mem. 7-9. Because the Court dismisses all claims over which it has original jurisdiction, it declines to exercise pendent jurisdiction over Plaintiff's remaining state law claims. 28 U.S.C. § 1367(b)(3).

## IV.   Conclusion

For the reasons set forth above, Defendants' motion is GRANTED.[16]  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 11, mail a copy of the instant Opinion and Order to Plaintiff, and close the case.

It is so ORDERED.

Dated:     September 3, 2014
          New York, New York

Edgardo Ramos, U.S.D.J.

---

[16] To the extent that the Complaint can be construed as an attempt to allege violations of the witness tampering statute, 18 U.S.C. § 1512, the Court also dismisses such claims. Compl. ¶ 11.  None of Plaintiff's allegations involve a witness threatened with physical force or death at an "official proceeding"—but most significantly, the witness tampering statute does not provide for a private right of action.